UNITED STATES, Appellant

v

WILLIAM F. KAUTH, Technical Sergeant,
U. S. Air Force, Appellee

11 USCMA 261, 29 CMR 77

No. 13,457

Decided February 19, 1960

*Major Simpson M. Woolf* argued the cause for Appellant, United States. With him on the brief was *Colonel John F. Hannigan.*

*Lieutenant Colonel Dwight R. Rowland* argued the cause for Appellee, Accused. With him on the brief was *Lieutenant Colonel James L. Kilgore.*

## Opinion of the Court

GEORGE W. LATIMER, Judge:

The accused was convicted[1] on thirteen specifications of larceny by check, all in violation of Article 121, Uniform Code of Military Justice, 10 USC § 921. He was sentenced to a bad-conduct discharge, total forfeitures, confinement at hard labor for six months, and reduction to the grade of basic airman. The convening authority affirmed both the findings and sentence; however, a board of review in the office of The Judge Advocate General of the Air Force granted a rehearing on both for an alleged error by the law officer in refusing to admit certain evidence offered by the accused. Thereafter, the case was certified to this Court under the provisions of Article 67(b)(2), Uniform Code of Military Justice, 10 USC § 867, with a request that we answer two questions. They will be mentioned specifically after we recite the necessary operative facts.

At the trial, the accused conceded that while on duty in Germany he wrote and uttered thirteen checks between December 29, 1958, and January 10, 1959, for which he received cash and that all were dishonored upon presentment. His theory of defense was that he honestly believed there was sufficient money on deposit in his account to pay the checks. He became a witness in his own behalf and testified that in February of 1946, he loaned his brother $600.00; that on

or about December 1, 1958, he received a letter from his brother who was living in the United States in which the latter stated he desired to pay $500.00 on the indebtedness and requested instructions as to where to send the money; that he replied and directed the funds be forwarded to his checking account in the Cocoa Beach State Bank, Cocoa Beach, Florida; that he had lost the letter; and that he waited approximately three weeks after dispatching his reply before he commenced writing checks on the account.

Accused was cross-examined by trial counsel, but none of the questions touched on the loan to the brother or the letter written by him. The thrust of the questions was toward accused's reasons for writing so many checks and his reaction when informed that his checks had been returned by the bank without being paid. After this cross-examination, the defense placed a character witness on the stand and when trial counsel declined cross-examination, defense rested. Thereupon, trial counsel offered in evidence a deposition taken at the request of the defense. The deponent was accused's brother, and in the deposition he testified as follows: He did not borrow any money from the accused; he did not offer to repay any sum of money; and the only correspondence he ever had with the accused was a letter dated November 17, 1958, which he

---

[1] ACM 16280

**263**

received and in it accused sought to borrow $400.00.

After the prosecution rested, the defense offered into evidence a stipulation of testimony which was objected to by the trial counsel. The objection went to the materiality, relevancy and competency of the evidence contained in the stipulation and not as to the form in which the evidence was offered. The stipulation was to the effect that if accused's wife was present in court, she would testify substantially as follows: In a conversation with the accused, he stated his brother had borrowed some money from him prior to their marriage; that the time the transaction occurred was not known to her; that the amount of the loan was uncertain but she believed it to be approximately $600.00; that the conversation took place about six years prior to trial; that there were several discussions on the same subject in the intervening years; and that some efforts were made by accused to recover the money without success.

The law officer sustained trial counsel's objection to the proffered testimony, and the accused's principal assignment of error before the board of review questioned the legality of the ruling. The board held the law officer erred in refusing to admit the testimony, reversed the findings and sentence, and ordered a rehearing. The Acting The Judge Advocate General of the Air Force thereupon certified the record to this Court, seeking an answer to the following two questions:

"a. Was the Board of Review correct in holding that the stipulated testimony of the accused's wife was admissible for rehabilitative purposes?

"b. If the first question is answered in the affirmative, was the Board of Review correct in concluding that exclusion of this testimony prejudiced the accused?"

As a starting point we call attention to the well-established rule that the judge in a civilian court is allowed a reasonable discretion in receiving or rejecting prior consistent declarations of a witness when he has been impeached, and consistent with our prior conclusions in similar situations, we believe that same authority should be granted unto a law officer. The evidence is hearsay and self-serving and unless it has some real probative value in rehabilitating a witness in an area where he has been assailed, it should not be admitted. There are many imponderables which necessarily influence its admissibility and a certain amount of latitude must be allowed the law officer in his determination of the extent the court should be concerned with such collateral issues. Accordingly, we conclude the ruling with which we are concerned was in a discretionary field and we should not reverse the ruling of the law officer unless we find he abused his discretion. United States v Nichols, 2 USCMA 27, 6 CMR 27; United States v Frye, 8 USCMA 137, 23 CMR 361.

We concede that the question before us is not without difficulty and that the correct rule may be even more difficult of determination when the witness is the defendant in a criminal prosecution. We believe, however, a troublesome area may be eliminated if we follow a primary rule which is invoked in most jurisdictions. It is stated succinctly in Wigmore, Evidence, 3d ed, § 1127. There the writer states:

"A former consistent statement helps in no respect to remove such discredit as may arise from a contradiction by other witnesses. When B is produced to swear to the contrary of what A has asserted on the stand, it cannot help us, in deciding between them, to know that A has asserted the same thing many times previously. If that were an argument, then the witness who had repeated his story to the greatest number of people would be the most credible. Nevertheless, a few Courts see fit to receive the evidence, misled by the traditional notion that it has some force."

Again, in American Jurisprudence, Volume 58, Witnesses, § 823, we find the same rule announced:

"The courts, with few exceptions, are agreed that a witness who has

merely been contradicted by witnesses on the other side, and who otherwise has not been impeached, may not be corroborated by proof of his previous consistent statements, however sharp the conflict of testimony."

From this rule of law it is clear the proffered testimony was not admissible merely because the accused had been contradicted and in that way discredited by his brother.

Moving on to consider whether the rejected testimony was admissible as an exception to the rule that a witness cannot corroborate his testimony by proof of having made prior consistent statements, we turn to the principles we announced in United States v Kellum, 1 USCMA 482, 4 CMR 74. After making some general observations we went on to say:

"There are, however, instances where exceptions to the general rule are recognized. Some of these are: (1) Where the testimony of the witness is assailed as a recent fabrication; (2) where the witness has been impeached by prior inconsistent statements; and (3) where the witness' testimony is discredited by an imputation of bias, prejudice, or motive to testify falsely arising after the date of the prior statement. The authorities generally hold that when the posture of the evidence is such that a witness has been discredited by one of the previous methods, then prior consistent statements may for certain purposes be admitted. However, in no instance is the statement admissible as substantive or independent supporting evidence. The sole purpose for permitting it in evidence is to refute the impeachment of the witness. When limited to this purpose it does not seek to prove the truthfulness of the contents and therefore does not violate the hearsay rule."

We will discuss the enumerated exceptions in the order stated there, but first we prefer to make a few observations about the term impeachment as it is used in the field of law. That word as applied to a witness in a legal proceeding means an attack on his credibility as a witness. It is a diminishing of his trustworthiness by the opposing side and by some means other than presenting conflicting testimony. Generally speaking, the method employed is to show the accused is unworthy of belief because of some personal act which is discrediting and which is distinct from the commission of the offense being tried, or by showing facts from which it may be inferred the witness has some personal interest in or bias toward the accused or the criminal act. But every form of impeachment does not permit rehabilitation by the showing of previous consistent statements and if conflicting testimony by other witnesses is discrediting and impeaching, the evidentiary door is barred to rebuttal testimony which seeks to restore credibility by prior self-serving declarations.

The first exception to the rule quoted in *Kellum,* supra, would be applicable if the testimony of the accused had been assailed by the prosecution as a recent fabrication. However, the record is barren of any showing which brings the stipulated testimony of the wife within that principle. In discussing that exception in his treatise, Dean Wigmore has this to say:

"Impeachment on the ground of Recent Contrivance must be distinguished (as it is not always) from the foregoing ground. It is more nearly connected with the case of impeachment by Self-Contradiction. The charge of Recent Contrivance is usually made, not so much by affirmative evidence, as by negative evidence that the witness did *not* speak of the matter before, at a time when it would have been natural to speak; his silence then is urged as inconsistent with his utterances now, *i.e.* as a Self-Contradiction (*ante,* § 1042). The effect of the evidence of consistent statements is that the supposed fact of not speaking formerly, from which we are to infer a recent contrivance of the story, is disposed of by denying it to be a fact, inasmuch as the witness did speak and

tell the same story. . . ." [Wigmore, Evidence, supra, § 1129.]

If there is any imputation in this record that the accused's version from the witness stand was fabricated, it must find its roots in his brother's disputing testimony and not in any evidence otherwise adduced by the prosecution. The record does not show any previous occasion when accused's failure to speak would be considered of any importance for there is no evidence to show any event which would make his silence inconsistent with his sworn testimony. He was not cross-examined about why he had not mentioned the same explanation at an earlier time nor was he asked any question which would imply that he recently fabricated the story. If his testimony while on the witness stand was not true, the most damaging part against him was his claim that he had received a letter from his brother containing an offer to pay. According to his story that promise induced him to issue the checks, but there is no testimony in the stipulation which shows a prior consistent statement to corroborate receipt of that letter. The accused could have loaned his brother the money as he claimed, but that would be unimportant as he would still be guilty unless his brother had led him to believe $500.00 would be deposited in his bank account. While we suppose it can be argued that in some way the loan might strengthen the testimony about the letter and thus remotely support accused's contention that he honestly believed funds would be forwarded, there was no attempt on the part of trial counsel to impeach accused's credibility either by question, innuendo, or insinuation which would lead the court to believe the prosecution was trying to impeach the accused by showing he had conjured up a false story. Nor was there any testimony or trial incident from which it could be inferred reasonably that if accused did fabricate, his trial version was of recent origin. The basis for admitting this sort of statement is not to prove the facts recited therein, but to rebut the inference arising from the conduct of the prosecution which has for its purpose a showing that accused concocted his story to aid his defense.

In that connection, laying aside the effect of the disputing testimony of the brother, there is no inference, insinuation, or innuendo supported by the evidence which the stipulation tends to overcome. Stated somewhat differently, the evidence of the wife cannot be used to prove the truth of the assertion that accused loaned his brother certain money. That leaves only the question of whether it was made competent by the tactic of the prosecution. Absent any attempt by trial counsel to discredit the accused by showing his in-court testimony was recently fabricated, the proffered testimony was inadmissible. The contradictory evidence by the brother will not support the admissibility for he may be the one who is fabricating his testimony. Just which of those two is to be believed is for the court-martial to decide, but neither can be corroborated by their prior consistent statements, for to permit that procedure would be to strengthen the one who was the most vocal.

The next exception involves a situation where the witness is impeached by prior inconsistent statements. This deviation from the general rule gives us little cause for concern for the reason that accused was not impeached by that method. The only evidence which might possibly be considered as reflecting on that theory was the statement by a witness, Sergeant Thomas, in answer to a question as to what the accused said when confronted with the returned checks. The Sergeant answered, "Each time he told me that this brother in the States was supposed to have deposited money in the bank, but he didn't evidently. At other times, he told me some guy was lending him money to make them good." That statement is not inconsistent with accused's story on the witness stand and it would not diminish his credibility in the slightest degree. It is suggested in appellate defense counsel's brief that the last sentence is inconsistent with accused's testimony, but we do not agree. That part of the answer is not contrary to any evidence showing an offer on the part of the brother to repay the loan nor to his dispatching of a letter. It is

only a statement of a means by which accused hoped to pay off the checks when he was told they were dishonored. The theory behind this particular exception to the hearsay rule is that if an inconsistent statement is admissible to count against an accused, a consistent one should be permitted to be introduced to count for him. That reason is inapposite here for the original statement is not inconsistent with anything said later by the accused. Both his in-court testimony and that portion of his pre-trial statment can be accepted as true without there being any conflict.

The last exception is founded in the doctrine that if the witness is impeached by a showing of bias, prejudice, or motive to testify falsely, a prior consistent statement may be shown. This exception is stated by Dean Wigmore in the following language:

"A consistent statement, at a *time prior* to the existence of a fact said to indicate Bias, Interest, or Corruption, will effectively explain away the force of the impeaching evidence; because it is thus made to appear that the statement in the form now uttered was independent of the discrediting influence. The former statements are therefore admissible. . . ." [Wigmore, Evidence, supra, § 1128.]

Again we are faced with the situation where the posture of the record does not justify admitting the testimony under this exception. It is worth noting that this principle is applicable only if the statement is made at a time prior to the fact which indicates bias, prejudice, or motive to testify falsely. The only fact in this record which would tend to impeach the accused upon any of those grounds is that he was the person on trial, but this standing alone is not impeachment. The person being tried for the commission of an offense is undoubtedly biased and prejudiced in his own favor, and he may have a motive to testify falsely, but the impeachment contemplated by this exception must be found in a diminishing of the accused's worthiness of belief by the prosecution and this record is devoid of any evidence developed by the Government which would have that effect. It may well be that the accused had a motive in making the declaration to his wife in the first instance and a different motive may have existed at the time of trial, but if so neither was developed for impeachment purposes. Moreover, while being charged with an offense may be a discrediting act which might tend to influence adversely this accused's credibility, and his subsequent trial may give him a motive to falsify, those happenings do not render his wife's statement admissible. If the rule was otherwise, then every accused person could introduce in evidence every statement made by him prior to his offense which was consistent with his in-court testimony. Under that guise he could very effectively strengthen his defense before he committed the offense. Obviously, if we adopted a rule which would permit that condition to flourish we would find military courts faced with a situation deplored by all students of the law; namely, that the person who advertised his virtues most vocally before committing an offense would have a wealth of self-serving statements to offer in his own behalf when he was brought to the bar of justice. The more often he repeated his story before he sinned, the more trustworthy he would become. We reject this thesis. While there may be exceptional instances which allow the use of this variation of the rule when a witness is an accused person, the record fails to support the conclusion that we are confronted, in the instant case, with that unusual situation. Our review of the authorities touching on this facet of the problem indicates this exception to the rule is applied principally in cases where bribery, reward, bias, prejudice, motive, or some other personal influence discrediting to the witness could be inferred from facts and circumstances developed by the prosecution extraneous to those necessary to establish the offense. Nothing of that nature is presented by this record.

For the foregoing reasons we conclude the law officer ruled well within discretionary limits. Hence he did not commit reversible error and, accordingly, the first certified question is an-

swered in the negative. For that reason it is unnecessary to discuss the other issue. The decision of the board of review is reversed and the record is returned to The Judge Advocate General for reference to the board of review for action not inconsistent with this decision, and such further review as may be deemed necessary.

Chief Judge QUINN and Judge FERGUSON concur.